IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:22-CR-148 |
| v. | |
| RYAN PATRICK VERMILLION, | |
| *Defendant*. | |

## STATEMENT OF FACTS

The United States and the defendant, Ryan Patrick Vermillion, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

### THE CONTROLLED SUBSTANCES ACT

1. Having determined that "[t]he illegal importation, manufacture, distribution and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people[,]" Congress enacted the Controlled Substances Act, codified at Title 21, United States Code, Sections 801 *et seq.*

2. There are five "schedules" of controlled substances, known as Schedule I, II, III, IV, and V. Substances are "scheduled" depending on their potential for abuse and recognized medical usage. A drug listed in Schedule II has at least one currently accepted medical use in treatment in the United States, but a high potential for abuse, with use potentially leading to severe psychological or physical dependence.

3. Oxycodone, commonly known by the brand name OxyContin, is a Schedule II controlled substance. Another common brand is Percocet, which contains a mixture of oxycodone and acetaminophen. Acetaminophen, the generic ingredient in Tylenol, is not a controlled substance.

4. Hydrocodone is also a Schedule II controlled substance, and is commonly sold under the brand name Vicodin, which contains a mixture of hydrocodone and acetaminophen.

5. Generally, no Schedule II controlled substance may be dispensed without a written prescription of a provider registered with the Drug Enforcement Administration ("DEA") to prescribe controlled substances. A provider with authorization to prescribe controlled substances is commonly referred to as a "DEA registrant." Such a prescription must be issued for a legitimate medical purpose by an individual DEA registrant acting in the usual course of his or her professional practice.

6. Section 843(a)(3) of Title 21 of the United States Code provides that it is unlawful for anyone to knowingly or intentionally acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge.

## THE WASHINGTON COMMANDERS

7. The Washington Commanders—formerly known as the Washington Football Team and before that, the Washington Redskins—is a professional football club in the National Football League ("NFL"). The club, referred to herein as the "Commanders" or the "team," has its home stadium in Landover, Maryland ("FedEx Field"), but its executive offices and team practice facility are in Ashburn, Virginia, which is within the Eastern District of Virginia. The team practice facility is known as the INOVA Sports and Performance Center at Commanders Park ("INOVA Center").

8. The INOVA Center includes training facilities, medical offices, training staff offices, and storage area within the training room. One of the medical offices is dedicated to the orthopedic physicians, and included an exam table, multiple drawers, and locked cabinets.

9. Beginning in and around January 2020, and continuing until on or about October 1, 2021, RYAN PATRICK VERMILLION was employed as the head athletic trainer for the Commanders. Other athletic trainers also reported to VERMILLION, as well as the athletic training interns.

10. At all times during Vermillion's tenure with the Commanders, the Commanders had physicians available to treat the Commanders' players and provide prescriptions as needed for medical care and treatment. Such medical care and treatment included both orthopedic care and primary care. The Commanders' physicians included both Doctor 1 and Doctor 2. At all times relevant, all Commanders physicians were DEA registrants; that is, they had the ability to prescribe, dispense, or distribute prescription drugs, including controlled substances in Schedules II, III, and IV.

11. VERMILLION was not trained as a doctor, nor licensed to practice medicine. VERMILLION also was not a DEA registrant; that is, he was not authorized to prescribe, dispense, or distribute any controlled substances.

### THE VISITING TEAM MEDICAL LIAISON PROGRAM

12. At all times relevant to the Information and this Statement of Facts, the NFL had in place a mechanism for injured NFL players to legally acquire prescription medication to treat injuries, particularly during away games. This mechanism was the Visiting Team Medical Liaison ("VTML"), and VERMILLION was aware of and familiar with the VTML program.

13. During every NFL game, the visiting team was assigned a VTML, who was an independent, locally licensed physician, typically with admitting privileges to a nearby hospital trauma center.

14. If a player required a controlled substance during a game—for example, if the player was seriously injured and needed pain medication like oxycodone—the VTML's role was to assess the player, determine that the medication was in fact needed, and issue a prescription to the nearest pharmacy. Then, a staff member from the team went to pick up the prescription, sometimes with a police escort to expedite the process, and bring the medication back to the player.

## VERMILLION'S CONDUCT

15. When VERMILLION joined the Commanders in or around January 2020, he became involved in decisions about storing and dispensing player medication, including controlled substances. VERMILLION had custody of one of the Commanders physicians' prescription pads, which bore the name of each Commanders physician and their individual DEA registrant number.

16. In the case of certain Commanders players who received a legitimate prescription for an opioid like oxycodone or hydrocodone, VERMILLION determined that the athletic training staff should give the player only a portion of their prescription and hold onto the remaining pills at the INOVA Center. VERMILLION made this determination based on his judgment that certain players were too immature or irresponsible to take custody of their own prescriptions. If those players required more of the pills from their prescription, they had to go through VERMILLION or the other athletic training staff to get access to their medication.

17. VERMILLION and the other athletic training staff maintained a black, soft-sided travel bag that they took with them to both home and away games. Inside the bag, they kept a variety of medications, including both controlled and non-controlled substances for use by the

4

athletic training staff and medical staff. If a player was injured at a game, VERMILLION had oxycodone or hydrocodone stored in the bag available to distribute to the player.

19. If a player was injured at an away game, VERMILLION did not go through the VTML to obtain prescription medication for the injured player. VERMILLION also directed others, including Commanders physicians, not to go through the VTML to obtain prescription medication for injured players. Instead, VERMILLION relied on the controlled substances maintained in the travel bag for distribution to injured players.

19. The travel bag also contained a supply of small, white paper envelopes in a pocket labeled "pill envelopes." If VERMILLION distributed medication—including controlled substances—to a player, he frequently provided the medication packaged in one of these small, white paper envelopes, or in a small, clear plastic bag.

20. Aside from the travel bag, a small quantity of oxycodone and other controlled substances was kept in a locked cabinet in the orthopedic medical office at the INOVA Center. VERMILLION had access to this cabinet. The controlled substances in this locked cabinet included pill bottles containing the remnants of prescriptions for oxycodone and other controlled substances that had been prescribed to particular players. If Vermillion determined that a player needed a controlled substance at the INOVA Center, VERMILLION would distribute controlled substances to the player from this collection of prescription medication, even if the prescription had been written for a different player.

21. From in or around January 2020 up through in or around October 2021, on occasions where VERMILLION provided controlled pain medication to players without a legitimate prescription, VERMILLION at various times requested and received written prescriptions from the team physicians to cover for the fact that he had provided controlled

substances to players without a legitimate prescription. VERMILLION did not always, however, give these "backfilled" prescriptions to the players.

22. Additionally, VERMILLION told some Commanders physicians to write prescriptions for oxycodone for players who, in VERMILLION's judgment, he believed should receive additional oxycodone. These team physicians generally agreed and complied with these requests.

## SPECIFIC DISTRIBUTIONS

23. The occasions on which VERMILLION provided controlled pain medication to players occurred during the 2020 – 2021 NFL season, and include, but are not limited to, the following:

*Player A*

24. A Commanders player ("Player A") suffered an injury at an away game. After the game, when Player A was aboard the plane with the rest of the Commanders on the flight back to Virginia, VERMILLION distributed a small quantity of oxycodone to Player A, who did not ingest the oxycodone because he did not feel that he needed it.

25. The next day, VERMILLION texted Doctor 1 that he had distributed three oxycodone 5-mg pills to Player A. VERMILLION asked Doctor 1 to write a prescription for ten oxycodone 5-mg pills—a larger quantity than what VERMILLION had distributed—to Player A to cover for the distribution. Doctor 1 complied with this request and issued the prescription for 10 oxycodone 5-mg pills. The prescription was filled, but Player A did not receive this prescription. Instead, VERMILLION kept the oxycodone as part of a stockpile in case another player was injured.

6

### *Player B*

26. A Commanders player ("Player B") suffered an injury at a game. After Player B was taken off the field and back to the locker room, VERMILLION distributed a small quantity of oxycodone to Player B, who ingested the oxycodone. No prescription for oxycodone was issued to Player B by any medical provider at or around the time of this distribution.

27. Thereafter, Player B had surgery, performed by Doctor 1, to address his injury. After Player B's surgery, Player B worked with VERMILLION and Doctor 1 to rehabilitate his injury at the INOVA Center. When he began rehabilitation, Player B had difficulty regaining his full range of motion without pain. In response, VERMILLION gave Player B a small quantity of Player B's prescribed oxycodone at the start of each rehabilitation session.

### *Player C*

28. A Commanders player ("Player C") suffered an injury at an away game. After Player C was taken off the field and back to the locker room, VERMILLION distributed a small quantity of oxycodone to Player C. After the game, Player C and the rest of the Commanders returned to Virginia.

29. The next day, Player C went to the INOVA Center for follow-up care. There, VERMILLION distributed an additional small quantity of oxycodone to Player C. On the same day, another one of the Commanders team physicians ("Doctor 3") wrote a prescription for 40 oxycodone 5-mg pills for Player C. The prescription was filled, but Player C did not receive this prescription.

30. Thereafter, Player C had surgery to treat his injury and received a prescription for oxycodone 5-mg pills from the operating physician. A short time thereafter, VERMILLION told another Commanders physician ("Doctor 4") that Player C needed more oxycodone, and Doctor 4

issued a prescription for 20 oxycodone 5-mg pills to Player C. Approximately three days later, VERMILLION told Doctor 4 that Player C needed another prescription for the same amount of oxycodone. VERMILLION told Doctor 4 that Player C's significant other had misplaced or lost Player C's prescription as an explanation for why Player C needed more oxycodone. The government's evidence would show that this did not happen.

*Player D*

31. A Commanders player ("Player D") was injured in a home game. After Player D sustained his injury, but before the end of the game, Doctor 1 treated Player D's injury with non-controlled medication; Player D was thereafter able to continue playing throughout the game. After the game, Player D went back to the locker room. There, VERMILLION distributed a small quantity of oxycodone to Player D. No prescription for oxycodone was issued to Player D by any medical provider around this time.

*Player E*

32. A Commanders player ("Player E") sustained an injury at a home game. Player E played through his injury and finished the game. After the game, Player E went back to the locker room, where team doctors treated his injury. There, VERMILLION distributed a small quantity of oxycodone to Player E. Player E did not feel that he needed the oxycodone, so Player E did not take the oxycodone with him when Player E left the locker room.

33. The next day, a prescription for Player E was issued under the name and DEA registration number of Doctor 1, for five oxycodone 5-mg pills. Doctor 1, however, did not sign or authorize the prescription, which was forged. The government's investigation could not confirm who forged the prescription.

*Player F*

34. A Commanders player ("Player F") was injured in a home game. After Player F was taken off the field and back to the locker room, VERMILLION sent a text message to another athletic trainer ("Trainer 1") stating, "I have pain meds in bag if he needs something." Trainer 1 texted VERMILLION, "You want me to give him just the 5mg Oxy and then Tylenol to take home?" VERMILLION replied, "Yes." Thereafter, Trainer 1 distributed a small quantity of oxycodone to Player F.

35. A prescription was issued for Player F, under the name and DEA registration number of Doctor 2, for 15 tablets of oxycodone-acetaminophen (commonly known by the brand name Percocet) on or about the same day as Player F sustained his injury—however, the prescription was not filled until the next day.

## THE SEARCH OF THE INOVA CENTER

36. On or about October 1, 2021, agents of the Drug Enforcement Administration ("DEA") lawfully executed a search warrant at the Commanders training facilities at the INOVA Center. At this location, agents seized a variety of different prescription drugs, including multiple bottles of oxycodone bearing prescription labels with different players' names on them.

37. For example, in a locked cabinet in the orthopedic medical office, agents recovered an orange prescription bottle with a label indicating that it contained only five oxycodone 5-mg tablets that had been prescribed to a Commanders player ("Player G") by Doctor 3. Player G did not recall ever being prescribed oxycodone by Doctor 3, and not at the time the prescription was issued. When agents examined the bottle more closely, it was found to contain eight oxycodone tablets.

9

38. Also in the locked cabinet, agents recovered an orange prescription bottle with a label that corresponded to the forged prescription that had been issued for Player E, referenced in paragraph 33, above. The prescription bottle contained oxycodone, a Schedule II controlled substance. As pertains to the Information and this Statement of Facts, VERMILLION did knowingly and intentionally acquire and obtain possession of this oxycodone by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of Title 21, United States Code, Section 843(a)(3).

39. Other prescription controlled substances found in the locked cabinet in the orthopedic medical office included Vyvanse, a Schedule II controlled substance; and diazepam and tramadol, both Schedule IV controlled substances. All of these substances were found in orange prescription bottles bearing labels indicating that they had been prescribed to a particular Commanders player, including at least one player who was no longer with the team.

40. Agents also found the black, soft-sided travel bag that VERMILLION and the athletic training staff maintained. Inside the travel bag were small, white paper envelopes in a pocket labeled "pill envelopes." Also inside the travel bag was a range of different medications, both scheduled and non-scheduled, in orange or blue pill bottles. One of the bottles was an orange prescription bottle with a label indicating that it contained oxycodone 5-mg tablets that had been prescribed to Player B, discussed above. When law enforcement examined the bottle more closely, it was found to contain two different types of oxycodone pills: six oxycodone pills that matched the pills on the label; and five combination oxycodone-acetaminophen pills that did not. The oxycodone pills were loose in the prescription bottle; the oxycodone-acetaminophen pills were contained in a small, clear plastic baggie that was tucked inside the prescription bottle.

41. The evidence collected shows that VERMILLION only distributed medication, controlled or otherwise, to players for the Commanders that were being seen by the team training staff in connection with football-related injuries. VERMILLION earned a salary from the team, and did not earn additional profit from the distribution of medication, controlled or otherwise, to Commanders players.

42. The parties agree that if this case proceeded to sentencing, the appropriate base offense level under the United States Sentencing Guidelines would be 12.

43. This Statement of Facts includes those facts necessary to support the deferred prosecution agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

44. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

45. If the defendant breaches the deferred prosecution agreement, then pursuant to the deferred prosecution agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

                                        Raj Parekh
                                        Attorney for the United States
                                        Acting Under Authority Conferred by 28 U.S.C. § 515

Date: 8/19/22      By: *(signature)*
                                Katherine E. Rumbaugh
                                Michael P. Ben'Ary
                                Assistant United States Attorneys

Defendant's Stipulation and Signature

After consulting with my attorneys, I hereby stipulate that the above Statement of Facts is true and accurate, and that if the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 8/19/22

_____
Ryan Patrick Vermillion

Defense Counsel's Signature

We are the attorneys for Defendant in this case. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is informed and voluntary.

Date: 8/19/22

_____
Barry Coburn
Marc Eisenstein
Counsel for the Defendant

13